versus the Bank of Edwardsville, 5-10-226. You probably noticed Justice Chapman is not with us when we came back out. She's recused herself from this case. Another judge will be assigned to the case, and we'll listen to the oral arguments on the audio of the oral arguments. So if there's no objection to proceeding in that way, we'll proceed. Okay. And it's Mr. Hanna. You may proceed. May it please the Court, Mr. Sprague. My name is Myron Hanna. I represent the Bank of Edwardsville. This case involves an extension of credit made by the bank to an entity known as Meijer Transportation, and then an attempted work out of that credit once the borrower defaulted, and ultimately the entry of a judgment against the bank in favor of an entity known as Meijer Logistics for amounts collected by the bank pursuant to the loan work out. I would call to the Court's attention that a chart illustrating the various agreements relating to this work out was presented to the trial court and is included in pages 11 and 12 of the appendix to my brief. This is a fact-intensive case. All the relevant facts are set forth in my brief, but I would like to begin my brief with summarizing. The credit given by the bank to Meijer Transportation in 2002 included a factoring agreement called a business manager agreement that Transportation used to pay for its business operations, and the credit also included several installment loans that Meijer Transportation used to pay for its trucks and equipment. Both the factoring agreement and the installment loans to Meijer Transportation were secured by all of Transportation's accounts receivable. Meijer Transportation generated accounts receivable by using its trucks and its people to provide cargo transportation for a regular group of customers on a recurring basis. Under the factoring agreement, receivables were basically sold by Transportation to the bank at a discount, and the bank then collected these receivables from Transportation's customers. In 2003, Meijer Transportation defaulted on approximately $700,000 worth of the same receivables that had already sold to the bank. The bank called Transportation on this default and told Transportation it would have to pay the bank in full for the amounts owed to the bank, both on the factoring agreement and the installment loans, and that amount in April of 2003 was roughly $1.3 million. Transportation, through its attorney, made a proposal to the bank in April of 2003. Transportation was owned by David and Douglas Meijer, and they were also guarantors. Gilbert Meijer, the father of David and Douglas, would create a new company to be named Meijer Logistics. Meijer Logistics would pick up the business where Transportation left off using Transportation's equipment, its personnel, its customer base, and management to continue to generate accounts receivable. Under the proposal made by Transportation, Meijer Logistics would now factor these receivables to a new lender. Logistics would pay $10,000 a month to the bank to pay off Transportation's debt to the bank, and Logistics would pay more quickly if possible to do so. And finally, the proposal called for Logistics to purchase the trucks from Meijer Transportation if the bank and Transportation could agree on a price. As it turned out, the truck purchase was not accomplished, but other parts of the proposal were done. By various agreements, Transportation, Logistics, and the bank basically operated under Transportation's April 2003 proposal in May and June of 2003. And again, that's depicted on the chart of agreements. On May 7, bank and Transportation entered into a pre-workout agreement where Transportation acknowledged that it now owed approximately $928,000 to the bank, and at $10,000 a month as previously proposed, that would take about eight years to pay off. On May 14, Meijer Logistics entered into a new factoring agreement with Interstate Capital Corporation. On May 22, Meijer Logistics entered into an agreement, sometimes called the interim agreement, where Logistics authorized Interstate Capital to pay bank 3% of a specific group of accounts receivable defined in that May 22 agreement that Logistics was selling to Interstate Capital. After May 22, there was a series of ten addenda to the interim agreement, each with its own specific set of additional accounts receivable, and that covered the period through June 26 of 2003. Toward the end of June, the parties found it was just too cumbersome to have the set of accounts receivable that Logistics was selling to Interstate Capital, and Interstate Capital wanted the bank to agree that the bank would not claim a first security interest in future receivables that Logistics sold to Interstate. To get the bank to make such an agreement to Interstate Capital, Logistics, through its counsel, agreed in a June 27, 2003 email that Interstate Capital should withhold and pay to the Bank of Edwardsville as set forth in the interim agreement between the parties 3% of the total dollar amount of invoices purchased from Meijer Logistics. In reliance on this June 27 email from Meijer Logistics, the bank then entered into the July 2, 2003 intercreditor agreement with Meijer Logistics, whereby the bank continued to receive those 3% payments from 2003 until the trial court ordered otherwise in 2010. In October 2003 and April 2004, the bank entered into forbearance agreements with Meijer Transportation, whereby the bank agreed to temporarily put Transportation was to pay the greater of $6,000 a month or 3% of Meijer Logistics receivables factored to Interstate Capital and to provide monthly financial information on Meijer Logistics. However, Transportation defaulted. The bank brought a reclaimed action in 2004. Now, Gilbert Meijer never guaranteed his son's loans. That's correct. And neither did, from a corporate standpoint, Meijer Logistics. That is also correct. And you'd be in a lot better position if they had. We wish we had been in that position. And I suspect that was probably discussed or they were maybe asked to do that. I don't know. But that didn't happen, did it? That did not happen. Now, what did Meijer Logistics or Gilbert Meijer, what was their stake in this deal other than the use of the equipment? What did they have to get out of being involved in any of this at all other than being able to use the trucks? Well, Logistics was generating receivables. Logistics then was receiving all of the receivables less the 3% that was being paid to the bank towards satisfaction of Transportation's debt. Right. Well, doesn't this all boil down to once the bank replebbed the trucks, then Gilbert Meijer and Meijer Logistics, they didn't have any stake in this at all. So why would they keep paying the 3% if they didn't have the use of the trucks? Your Honor, the position, our position is that the bank would not have agreed in the first place to release its claim on those receivables being generated by Logistics had Logistics not committed that from this point forward, and that's what the e-mails indicated, that 3% was going to be paid to the bank. And so, in other words, the bank was counting on Logistics was going to satisfy, even though they had not signed initially. Okay, you were treating them as if they were a guarantor even though they never guaranteed the debt. Is that a fair statement? I don't think we're saying they were a guarantor. Well, you're saying there you expect them to go ahead and pay the whole debt off, even though they no longer had the use of, if necessary, ad infinitum, even though they didn't have the use of the equipment. The distinction I'm making is that they weren't a guarantor of the onset, but once they committed in June of 2003 to pay 3%, at that point we believe that they were liable contractually to continue to pay that 3%. So it's questionably a win. It's not a guarantee, but it was an agreement made after the fact in consideration of the bank not exercising remedies that it had at that time against transportation. What's Logistics and Gilbert Meyer, what's their consideration for continuing to make these payments? What do they get out of it if they're not using the trucks anymore? Their consideration was benefit, well, first it was benefit to a third party. It was a benefit to transportation and the principles of transportation for the bank not to immediately pursue those entities for liability. So, again, it's a third party. Sure, as long as they're using the trucks and the bank hasn't replanted, certainly I see, I understand there. And then the other consideration is the fact that the bank did not seek to exercise total control over all those receivables that were now being generated by Logistics in consideration of the bank not taking that step. That was the consideration that supported Logistics agreeing to a 3% payment in the future toward that satisfaction. And forever until the entire balance of somebody else's debt is paid. That's correct. That is the position, yes. Okay. All right. Well, my first argument along the lines relates to the proper interpretation of the various agreements made between the parties for those payments to be made to bank from Logistics. By these agreements, the bank basically accepted transportation's proposal made in April of 2003 that the operations would now be conducted by Logistics. The bank would not immediately claim that all the receivables generated by Logistics was actually transportation receivables that the bank had a security interest in, and the bank would not immediately pursue the individual guarantors and transportation for the debt. Contrary to the trial court's finding, there's no evidence to establish that the May 22, 2003 agreement to pay the bank the 3% was conditioned on the bank allowing Logistics to use transportation's trucks. As a practical matter, Logistics might or might not have been able to continue to operate if the bank had at that juncture repossessed those trucks, but it was not a contractual commitment. It's clear there was no connection in the April 14 proposal made by Mayer Transportation between the $10,000 amount that Logistics was to pay the bank and the value of the trucks being used because the proposal had separate provisions for paying the $10,000 and for transportation selling its trucks to Logistics if the parties could agree on a price. There was nothing in the writing in the written May 22 agreement that made any condition of continued use of the trucks, and there was no credible substantive testimony by any person to such a condition. David Mayer gave a conclusory testimony that it had been his understanding that Logistics would be allowed to continue to use the trucks. His testimony further was that this condition could be found in the forbearance agreements. Well, that's not correct. There's nothing in the forbearance agreement that says they get to use the trucks. He gave vague testimony that he had been told by one of the bank's representatives that Logistics would continue to use the trucks, but he couldn't testify when that happened or who was at that meeting, and our position is that's tantamount to really no testimony at all. Because there was no substantive evidence of mutual intent to condition this, this payment of 3% of receivables on use of the trucks, we submit that the trial court's finding was against the manifest weight of evidence. If the intent was, if the intent of Logistics and or its principal Gilbert Myers was to agree that no matter what they're going to pay, eventually pay off this debt, why wouldn't they just guarantee it? Why didn't they just sign a guarantee? I don't know the answer to that. It didn't happen. I'm sure the bank would have preferred that it happened that way, but there were a lot of, and again, multiple parties involved here. It also involved this interstate capital who was doing receivable factoring, and so I don't have a clear answer of why that did not happen. I mean, I'm sure the bank would have pursued or wanted a new guarantee from a solvent person. Well, I guess to another extent, I mean, a guarantee would have absolutely committed Logistics and its principal to pay that no matter what. Here, they only had to pay as long as they were actively succeeding in business and selling their receivables to interstate capital, and so if that had discontinued, then Logistics would have had no further obligation. So I guess from their perspective, this would have been a preferable way to do business rather than have an absolute unconditional guarantee that they would be bound by no matter what happened in the future with their business. They could have had a conditional guarantee, though. Well, they could have. They could have. But again, we're unfortunately— Could have, should have, yeah. Our next point is that even if the May 22 agreement could have been found to be conditioned by the continued use of the trucks, there's certainly no evidence that this June 27, 2003 email agreement had a similar condition. The trial court made no finding with respect to that June 27, 2003 agreement, and accordingly, I believe that that is a question for de novo review by this court, the proper interpretation of that contract. And again, the emails that constitute that contract are included in the appendix to our brief. And finally, the trial court found that subsequent forbearance agreements made in October 2003 and April 2004 to which Meijer Logistics was not a party, superseded logistics duty under its prior agreement with the bank, whether it was the—well, actually it would have been the June 27, 2003 email agreements. Clearly, a contractual commitment entered into by a party other than the— it cannot take away from the party's commitment. Logistics was not even a party to those forbearance agreements. My second argument relates to the voluntary payment doctrine. Essentially, logistics was not required to continue to factor its accounts to interstate capital, but nonetheless continued to do so even though logistics very well knew that interstate would continue to withhold and to forward to the bank those 3 percent payments. In the Harris v. Chartwell case cited in my brief, and the Ara v. Burst Bank case cited in Appelee's brief, courts essentially held that whether there was a compulsion to pay or whether there was adequate protest to make such payment involuntary had to be determined from all of the circumstances. I believe this is a classic case of voluntary payment. It's consistent with the case law cited. In this case, all logistics had to do to discontinue payments to the bank was to stop factoring its receivables through interstate capital. The trial court made no finding on the issue of voluntary payment, but its failure to find who defended on this issue was against manifest way of the evidence. Our third and final argument relates to the alter ego affirmative defense. David and Doug Meyer's father, Gilbert, established logistics as the key part of the workout plan proposed by transportation to the bank. David and Douglas Meyer immediately began running Meyer Logistics. They performed the same services with the same customer base from the same business location using the same equipment and personnel. Evidence of trial demonstrated a significant unity of interest and ownership between transportation and logistics, notwithstanding the technical ownership of logistics by Gilbert Meyer, the elderly father of David and Douglas Meyer. Well, at the initiation of this entire thing, I mean, as I understand what happened was, the bank was ready to collect their loan. Meyer brothers were in default, and had something not happened, the bank would have gone in, repossessed the trucks at that time, sold them, applied it to the debt, sued for the balance, whatever, okay? But what was proposed was the father comes in and says, I'll form a new separate entity, right? Correct. And that entity will take over using these trucks and servicing these customers or whatever, and through a combination of agreements here, money will get paid to the bank. And the bank agreed to this being taken over by a new separate entity, right? That's correct. So, I mean, the bank was certainly aware that this new entity was going to be operating the same accounts, servicing the same customers, doing the same business at the time that agreement was made. That's correct. The bank was aware of that. The injustice occurs when logistics then reneges on its commitment to continue to make these payments. And that is the point at which it becomes, you know, to sanction the fiction of separate existence of the two entities. That's where that becomes unjust. Okay. The 3% was being paid all along by logistics, is that right? It was. And refresh my memory, because this is a factually intense case. What happened that caused the bank to file the replant? Well, in addition to paying the 3% payments, it was the greater $6,000 a month or 3% in requirement that other financial information be provided to the bank. Shortly before that forbearance agreement expired, the bank determined that transportation was not complying with its requirements under that forbearance agreement. And at that point, there were only three or four days left in the forbearance agreement. But at that point, the bank declared a default and then proceeded to repossess. That had nothing to do, though, with logistics making its 3%. That was being done. That was being done because, right, because interstate capital was continuing to pay. That's correct. All right. You'll get a chance for rebuttal. Thank you. All right. Mr. Spray? May it please the Court. My name is Robert Spray. I'm an attorney for Meijer Logistics. And this is a case of dad bailing out his son. Mr. Hanna told you most of that. I'm not going to say it's devastated any facts. But you need to look at the agreements. Meijer Transportation was owned by Gilbert Meijer's sons, David Dennis and Douglas Meijer Transportation. And I believe the container, he said, was both indebted to the Bank of Edwards Bill. They entered into a factory agreement. They collected $700,000 of receivables that they shouldn't have. So the bank sent them a letter and called all their loans. Then they sat down to try and work this out. Gilbert Meijer, who owned Meijer Logistics, was never indebted to the bank, never signed a guarantee, as you asked him. But they did enter into an agreement dated May 22, 2003, which we'll call the Interim Agreement. And if you look at that agreement, on its face you can tell it's a temporary agreement. It says, whereas the parties are negotiating an interpredator and standstill agreement, whereby a new factor can factor the accounts receivable of logistics with consent of the bank and agreement of the parties, and whereas until an interpredator and standstill agreement can be finalized, a new factor will designate a factor of accounts receivable of logistics secured, excuse me, a bill by logistics which lists the accounts receivables attached to Exhibit A. As Mr. Hannah told you, they repeatedly updated Exhibit A to allow a factor to take 3% to give it to the bank. Mr. Gelbach of the bank testified that the language of the Interim Agreement meant that eventually they would reach a final agreement, which they never did, but there's testimony from David and Gilbert Meier that the consideration for this agreement was the use of Meier Transportation's trucks. Gilbert Meier started his own business, used their trucks, let them take 3% of the factor. And I'm sure there's a question in your mind, why didn't they switch factors? There's testimony that he couldn't, with all this going on, he couldn't switch factors. He had to stay with ICC and he needed to factor his accounts receivable. So is there evidence in the record that he tried to switch factors and nobody else would take the account? He testified that the reason he didn't do it was because nobody else would take his factor and then he would factor. After they entered that agreement, again, you've got to look at the agreements. October 22nd, 2003, April 14th, 2004, they entered into what were called Forbearance Agreements. Meier Logistics, or Gilbert Meier, was not a party to those agreements. And those agreements, in page 4A, states that the borrower, who is Meier Transportation and is guaranteed by David and Douglas Meier, would make monthly payments of $6,000 a month or make monthly payments in amount greater of $6,000 a month or not less than $12,000 over 2 consecutive months or 3% of gross invoices amounts purchased by Meier Logistics. Paragraph 13 in both those contracts reads, This letter of agreement constitutes the entire understanding and agreement between the parties pertaining to the subject matter hereof and completely and fully supersedes all prior and contemporaneous understandings or agreements, both written and oral, between the bank and the borrower. And it's our contention that these agreements in the court of fines superseded the May 22nd, 2003, agreement. It's obvious in terms of that agreement, it was temporary. It didn't say how long he was going to factor. It didn't say how much money they could collect that he could factor. So the agreement wasn't complete. And there was testimony that the consideration for the May 22nd agreement was the leasing of the trucks. They sent a third agreement after the last agreement expired in June, the forbearance agreement in June of 2004. They sent a new agreement. They wanted them to exercise a third forbearance agreement. Douglas Meyer testified that they wouldn't execute the agreement because the bank was trying to force Gilbert Meyer to sign a guarantee for the loan, which he wouldn't do. In December, David A. as attorney, Brian Bafta, writes to the bank to tell them to quit taking the money. In October, attorney Bafta, not Bafta, Bafta was David's lawyer, wrote, told ICC to quit taking the money, but nobody quit taking the money. So after they refused to sign the last agreement, the bank repossessed all the trucks that Meyer Logistics was using. Meyer Logistics went out because Gilbert Meyer was financially solid, went out and got his own trucks and continued operating, and they kept taking the money off of his accounts receivable. That was a question I had that wasn't clear to me from the record. So Meyer Logistics went and bought new equipment after the bank repossessed. He didn't end up buying it from the bank or anything like that. It was totally separate equipment. Right. And so at that point, the bank then continued to receive the 3%. And the bank kept taking the 3% in the bank, even though Bafta notified them to quit doing it, and they repossessed all the trucks, and they filed suit against Meyer Transportation and the two sons for the money on the loan. The important part of this case is the standard of review, and the standard of review is whether the decision of the trial court is against the manifest weight of the evidence. It should be pointed out that a judgment following a bench trial is against the manifest weight of the evidence only when an opposite conclusion is apparent and when the findings appear to be unreasonable, arbitrary, or not based on the evidence at the trial. I think if you look at Judge Gleason's order and if you look at the transcript, you'll see that Judge Gleason's – you'll see that you can't find that his ruling was against the manifest weight of the evidence. He found that the May 22nd agreement was entered with the intent that it was a temporary agreement to be superseded. He found that it was superseded by the forbearance agreements, which the forbearance agreements say even though Gilbert Meyer or Meyer Transportation wasn't part of the forbearance agreements, it securely stated any contract the bank has with the borrower, who is Meyer Transportation and Gilbert Meyer's son, is hereby terminated and all – both written and oral. And that's set forth in the paragraph 13 that I read to you earlier. He also found that even if the forbearance agreement didn't terminate it, there was a failure of consideration because after they repossessed the trucks and they sued the corporations, Gilbert Meyer was given – there was no consideration for his paying 3 percent of his factored receivables to the bank. He wasn't a party to any loans with the bank. He wasn't receiving anything from the bank because they had repossessed everything. And I cited in my brief cases on failure of consideration, a failure of consideration is sufficient ground and equity for a rescission of the contract. And the test as to whether a particular failure of consideration constitutes the meritorious breach of contract is whether or not it respects which failure or performance occurs in such a matter and such importance that the contract has been made without. In this case, after they repossessed the trucks and after they go after Meyer Transportation and even if you think the contracts are valid, still valid, even after they repossessed the trucks and after they sued Meyer Transportation and Gilbert Meyer's son, he's receiving nothing for paying 3 percent. I heard you say a minute ago that the bank asked or wanted Gilbert Meyer to guarantee the loan. Correct. And when did that happen in relationship to their levy? After they entered two forbearance agreements, they were negotiating another one. You know, the forbearance agreements had termination dates on them. And while they were negotiating a third one, the sons of Meyer Transportation said we're not dealing with it anymore because they were insisting that Gilbert Meyer guarantee the loan. This was right before they repossessed the trucks, I guess. After they refused, there was two forbearance agreements executed. After they refused to execute the third one, that's when they repossessed the trucks and instituted a lawsuit against Meyer Transportation and the son. Counsel, could you comment on the bank's theory that there was a voluntary payment? Yeah, I would like to comment. I commented on that in my brief. I think it's totally ridiculous. The case of Eilerstein v. Rosewell says that the payment is made under protest and is stripped of its voluntary character for purposes of voluntary payment. In this case, there's evidence in the record where Brian Babcock told the bank to quit taking the money, and they filed this lawsuit. I mean, in this lawsuit to protest, you know, they filed this lawsuit to stop them from taking the money. So I think trying to say that it's a voluntary payment is ridiculous. I mean, I think the lawsuit is a protest, but there's evidence that Brian Babcock wrote it. Also, they're trying to hang onto the emails, trying to say the June 27th email. It's a contract, June 27, 2003, but you have to look at the email. It's from Dan Stevens, who is a lawyer to ICC. On behalf of Meyer Logistics, this law authorizes interstate capital to withhold and pay the Bank of Edwards bill 3% of the Bank of Edwards parentheses, as set forth in the interim agreement between the parties. He was specifically pointing to the May 22nd, 2003 agreement, 3% of the total dollar amounts receivables purchased from Meyer Logistics LLC under the factor agreement between Interstate Corporation and Meyer Logistics. That's the first email that they – she specifically says you can have the 3% pursuant to the interim agreement, which is the May 22nd, 2003 agreement. They cite two other emails, but those emails, Dan Stevens' emails, the 10-20, there was an email from Cone at 11-33 and another one back from Dan Stevens on the same day at 1-49. But all this conversation started about you can do this factoring of amounts receivable pursuant to the interim agreement. So our codes don't alter anything. They don't alter the contracts. She's just confirming that they can get 3% of the receivables pursuant to the interim agreement. As to the piercing the corporate bail, I've cited case law in Illinois, and the court found that – the court specifically found in this order – the evidence in this case does not justify a piercing the corporate bail in the finding that Meyer Transportation, Inc. or Meyer Container and Trailer Services so controlled affairs of Meyer Logistics that Meyer Logistics, Inc. is a mere instrumentality or dummy of Meyer Transportation, Inc. or Container and Trailer Services, and this finding does not sanction fraud or promote injustice. The evidence is clear. Gilbert Meyer never had anything to do with Meyer Transportation or Meyer Container. The evidence is clear, again, that Gilbert Meyer was the only shareholder of Meyer Logistics, and the only relation they had at all is that Meyer Logistics, for a short period of time, was renting these trucks from the bank and allowing the bank to take 3% of the accounts receivable. I think it's clear to review the evidence in this case. If you look at the law, you've got to look at the language of the contracts. I think the contracts are clear. The May 22nd agreement clearly states it's a temporary agreement. It ended. It's our position the forbearance agreements killed it. They both said all the contracts between the debtor and the bank are superseded and no longer mean anything. The borrowers and the debtors were part of the May 22nd agreement. Even if that didn't happen, the court was correct in finding that the consideration for the May 22nd agreement was the leasing of the trucks, and the court was correct in finding that when they repossessed the trucks, all the consideration for the contract failed, and therefore the court was correct in entering the judgment. If it did, this judgment should be affirmed. Thank you. Mr. Hannon. Just a few points on the voluntary payment issue. I don't believe the evidence was as strong as might have been suggested of the ability or the lack of ability of logistics to change who they factored to. Essentially, David Meyer testified in a very conclusory manner that either there was a credit reporting problem or a business decision by other factoring companies that kept him from moving the factoring from interstate capital. Well, they did have their attorney send a letter saying stop taking the money, right? And so beyond that, your argument is that if they didn't quit using this factor, then it was voluntary, even though they sent a letter saying don't take the money. That is our argument. I think the case law supports it. In my brief, I cited warnings, floor covers, a second district case that held that protest may serve as evidence of compulsion, but that it is not conclusive. And then in the Smith v. Prime Cable case, also cited in my brief, the first district held that even filing suit against the cable company was not a sufficient protest to take payments, in that case, out of the voluntary payment status. So I think you have to look at the issue in the totality. And here, there's a very clear way to stop paying, and that's to stop selling to interstate capital. And all that evidence was presented to the trial court, and it's a manifest weight standard. Well, on this issue, the trial court made no ruling on voluntary payment. Well, there's no specific finding. I guess that's right in that order. There's no finding on voluntary payment, but I would submit that... I guess we can presume, since they got judgment, that that argument was rejected. Well, even if you presume that, I would still maintain under manifest weight that the manifest weight would support the voluntary payment defense. Next, on the argument of failure of consideration. Well, in connection with that, it's argued that... I heard rescission come up. Well, you can't say there's failure of consideration under this case when the bank had always done everything that it said it was going to do. The bank did not, at that point, file its lawsuit against the principal obligors. The bank allowed this factoring agreement to go forward. In cases of failure of consideration, to support a rescission, there has to be the ability to put the parties back in their original status. There can be no rescission in this case where the bank already gave up the rights that it would have had in 2003 and 2004. And so I think that's a bit of a red herring to talk about failure of consideration. So the next point, the question of the... Well, it was raised about the forbearance agreement because of its language saying it superseded everything prior to Cleveland parties. Well, that may be, but the point is, Meyer Logistics was not a party to that forbearance agreement. That forbearance agreement, no matter what it said, cannot supersede the agreement that was in place between the bank and Meyer Logistics. And that agreement comes back to the June 27, 2003 email. That is the real, probably the strongest part of this case. That constituted a contractual undertaking that this court should enforce and require that those payments be allowed to the bank. There was a reference in the very brief email of how, as set forth in the May 22 agreement, I would submit that as set forth in the May 22 agreement, really only provides a direction to interstate capital of how those payments are to be made. And in fact, under the May 22 agreement, it was very explicit that those payments were made to a specific account. And that account then was credit to the outstanding obligation of Meyer Transportation under that business manager agreement. So the better reading of that agreement has nothing to do with the, other than the direction of how the payments are to be made. And for all those reasons, we would request this court reverse the order of the trial court. Thank you. All right, thank you, gentlemen. We're going to take this matter under advisement and render a decision in due course.